Good morning, Your Honors. Paul Reynolds on behalf of Appellant and Defendant. Good morning, Your Honors. Bruce Prate on behalf of Chief Danny Macagni of the City of San Mariano. And if I could start out with just an analogy or a hypothetical to Chief Macagni's position in this case. Let's say that one of Judge Fragers and his clerks... Oh, don't bring me into this. Okay, sorry. Try Judge Kaczynski, okay? There you go. All right. All right. Let's say Judge Kaczynski, one of his clerks... No, that's not a good idea either. Whatever you want. Let's do whatever you want. Too many judges. All right. Too many judges. We'll make an anonymous judge. Anonymous. In the Ninth Circuit. Yeah. No, no, no. In the Fifth Circuit. In the Fifth Circuit, yeah. There you go. ...sends a letter to the newspaper critical of another appellate judge. In fact, calling one of those judges' opinions ludicrous. Happens all the time. Happens all the time in the newspaper. The judge whose clerk sends that letter calls the receiving judge, says, I apologize, it's certainly not the position of the court. And the receiving judge says, no problem. I just don't want that clerk in my chambers anymore. It's not welcome in my chambers. All right? Did the receiving judge violate the clerk's First Amendment right? Clearly not. By simply saying, yes, I read the letter, I appreciate you calling, I just don't want that clerk, the clerk isn't welcome in my chambers anymore. Well, that's a different situation. Are you representing the chief? Yes, the chief. I am only the chief. But he's the person who supposedly said this, right? Said he's not welcome. I don't want the person in my chambers anymore. Right. Exactly. Well, let's take the real facts, okay? Because judges have different issues. All right. If he committed a First Amendment, if I walked, if I was not an employee of anybody, and I, I mean, I was of somebody, but not of the government, and I write a letter to the newspaper criticizing the chief, and the chief says, you know what, you're not welcome here anymore, you know, if you have a problem, then he calls the police, don't call me. All right. Is that a First Amendment violation? Two questions to your question, I suppose. One, does the chief make this comment unsolicited? In other words, does he initiate, which I think is a very big distinction here, because the district court Why? I mean, he has no right, the ultimate question is, does he have the right to ban somebody from the police premises who he wouldn't otherwise ban because of something they said? That's the ultimate question. Yes, he does certainly have the right to ban the person from the controlled, restricted areas of the police department. Why? Why? Because he has, there's all kinds of governmental issues. If he has a disgruntled person coming into controlled areas of his police department and undermining his ability to run his agency, he can say, you're welcome in the public area. Well, that fact is disputed, isn't it? Isn't there a dispute about what was said and was it one version of it, you can't come here, period? I don't think there really is. Are you representing the chief? Yes. Well, that's not what I understand the chief said. The chief said it doesn't bother him. Right. Yeah, it doesn't bother him. So why are you putting the chief in that light right off the bat? I'm not suing the chief. I represent the chief. He has the right to say in response when the DA's office calls him. Well, what he said, okay. Right. He says, he's your problem, DA's office. Well, that's what he says he said. But somebody else says he said, I'm angry and he can't come here anymore. Well, and I understand that they're trying to create a material issue of fact, but in reality when you look at the record, the DA's office says in their written memo that Chief McConyer said he's not welcome at Santa Maria PD. Okay. It doesn't say he's banned, just not welcome. And Branson. Is that a distinction? Well, I think it absolutely is. He's not welcome here. He can come into the front desk any time he wants like any other citizen. They say that? The chief says that, sure. He said this memo says he said that? No, the memo was written by the DA's office. The chief had no more involvement. The chief got a call from the DA. Is there not a conflict in the record as to what the chief said? I don't think there is. The chief acknowledges he's not welcome. That's what he says. The DA's office writes a memo saying we talked to the chief. He says Prancevic is not welcome. And it wouldn't be a permissible inference that it means that he just can't come here at all? No, I don't think. How could the chief even infer that somebody can't come into the front desk to report? Well, what point are you trying to make? The point is that, well, first of all, there's no constitutional violation by Chief McConyer to say this guy can't come to the restricted areas. Well, what if you draw the inference that what he was saying, in effect, is he can't set foot in this building again? Do you agree that there would be an issue there, that there would be a First Amendment problem at that juncture, if that was a reasonable inference that could be drawn from what the DA said? Do we have a problem then? We have. I don't think you can ban anybody from the actual premises. But, again, the facts are not. Even Prancevic in his own brief in the record says he didn't like the fact that he's now going to be treated differently because he has to wear a visitor's pass if he comes into the restricted areas of the police department. That's his position. The DA's position is they were told he's not welcome. They drew the inference. Well, can you tell me why it would be a legitimate basis for changing his previous access because he criticized the police on something that had nothing to do with his access in a public letter? Why is that okay? His speech was not entirely protected. He can say, you know, the city of Santa Maria is a haven for illegal immigrants, which is the essence of his letter. He can't say the chief has lied. Why not? It's the First Amendment. He's certainly protected by the First Amendment if he says that, no? Is he acting in his private capacity? No, in his private capacity. Okay. Then if he's acting in his personal capacity, why don't we get the right to treat him as a private citizen? That is, you come into the police facility like anyone else. But if he's ñ what you're saying is just contrary to, you know, decades of First Amendment law. I mean, when he comes into the ñ he had a professional relationship. He did nothing in that professional relationship that caused anybody any problem. Is that right? Well, if he's not acting in his professional relationship. Right. Okay. And in his private capacity, he wrote a public letter saying something that has nothing to do with his job, that he disagreed with what the police said and the police was lying or whatever. What does that have to do with whether he can ñ as an investigator, he can come in and do what he was doing before? Well, and Chief McConaughey took no action. He read the letter. He blew it off. Well, apparently he did. I mean, at a minimum, you're telling me that he said he couldn't have the same access he had before. Only when the employer, the DA's office, called the chief and said, I apologize for what he wrote and I'll take care of it. There's no discussion in that conversation or at any other time about you need to transfer him, you need to do anything to him. Well, apparently there's a discussion that says that if he wants to come here anymore, he can come in his capacity essentially with the access that he had as an investigator for the DA's office. He has to be treated like a member of the public. I'm not going to recognize him as a person with access as a professional because of his job. Right. And the police chief certainly has the right to control his facility. He doesn't have to give Prancevic or any other police officer access to control areas. If he says this guy is a malcontent, he's going to undermine my authority. He's going to be disruptive to the confidential. Is there any evidence of that? Well, you know, we do have disputed issues of fact here. We've got to get into that, too. I don't know. I don't know. I don't understand why you're bringing all this up. Well, the question really here is qualified immunity. So your ultimate position is that if somebody goes, if somebody is doing their job every day in a perfectly fine way and says something in public, in a public forum that has nothing to do with his job, which is critical of the police, you can, I mean, if you can prevent him from having the same access he had before, I suppose you could fire him, too, if he was an employee. I suppose he was a policeman. Okay, so now he works for the chief? He works for the chief, and he writes a letter on something that has nothing to do with his job. I agree. Totally different issue. Why? We're not the employer. That makes you better? That gives you more authority? We didn't take the adverse action against him. Well, you took an adverse action against him, which impeded his ability to do his job. But the distinction here, and the district court relied on the Claremont case, obviously, which is the very first time any non-employer was ever put in a position to violate somebody's First Amendment rights. But you agreed with me that if somebody was just a member of the public and the police said, you know, we're just not going to deal with you anymore because you said something nasty about the police, that that would be a First Amendment problem. No. The difference is the chief never said we're not going to deal with you anymore. We're going to deal with you as a private person. If a citizen wrote a letter about the chief that was critical of him, and the chief said — But he's not a private person. So as between two investigators for the DA's office, he's going to be treated differently and make his job more difficult because of something he said that had nothing to do with his job. Well, but he can't have it both ways. He can't be acting as a private person. Why not? Well, then we're treating him as a private person. We're saying, you come to the police department, you'll be treated as a private person. I'm sorry. Your argument makes no sense. Well, I just don't understand where in Claremont the court, the municipal court, called the employer and said, we don't like what your guy did. Therefore, we're going to cancel your contract if you don't get rid of him. Chief McConaughey didn't initiate anything. He read the letter. He said, I'm not going to retaliate. I'm not going to do anything. But then he did. Because the employer called. So what? He still then retaliated because of what he said. Where are the chief's First Amendment rights? If this was in state court, I know we're not, this would be an anti-slave action. Well, the chief exercised them. He wrote a letter, got in the papers, that said Santa Maria is not a sanctuary city. And it goes on and on, you know. And when the, I mean, is the court saying that if the employer calls. I'm not saying anything. I'm just, I, I'm just telling you there are disputed fact questions here that need to be resolved. Well, and assume that the chief made an absolute ban. Okay. If that's the disputed fact, and now we look at it most favorably to Prancevic in this case. Where is the clearly established law that says that a police chief receiving a call from an employer can't comment that I don't want that guy in the restricted area of my police facility? Are you saying for it to be clearly established law that we have to find a case predating this one that has the identical facts or it's not clearly established law? Is that your position? I'm saying there has to be a case that tells a non-employer, if you receive an unsolicited call. What does the unsolicited call have to do with anything? I think it's huge. Because in Claremont, which is the case the district court relied on, that was a new circumstance that a third party could somehow violate an individual's First Amendment when they initiated the action to call the employer and say, we're not going to deal with you anymore if you don't get rid of this guy. It's not what we have here. And the case would have come out differently if the phone call had come from the other direction? I think absolutely. Are you going to do anything about this? No, we're not going to deal with you anymore because of it. That would have been a different case. I think so. And how is a reasonable police chief or anybody in the government supposed to know, if I get a phone call from an employer apologizing for their employee, that I now have to say, I can't comment? And if I do comment? No, you could have said, apology accepted. Apology accepted? Right. And I don't want that guy in the restricted area anymore. Right. I'm sorry? Okay. And I don't want that guy in the restricted area's retaliation. So either you have to demonstrate that it is nonetheless meets the – it's not a First Amendment violation because he has some super – either a balancing test or a – meets a strict scrutiny reason why he doesn't have him in the protected area. You don't have – you can't just say, I'm sorry, I'm not letting him in the protected area because of something you said. That's what he did, right? Well, that's – yes. In essence, he said, I don't – I'm not going to give him – Because of something you said, I'm not letting him in the protected area. Essentially, yes. Even though he was allowed in before and as part of his job, he's always been let in. And everybody else like him, I assume, is let in, too. Yes. All right. And you don't need any reason for that? No. And, I mean, the cases are – there's hundreds of cases that say the government has the ability to restrict their facilities, restrict access to their facilities, especially in a law enforcement area. But not for retaliatory reasons. The First Amendment is not an absolute protection. Okay. So what's the reason? The reason is he's going to undermine my ability to run a police department. He's going to have access to controlled areas, confidential information. And he's saying that we don't do our job right, that we're this haven for illegal immigrants, which is contrary to his role as a law enforcement officer anyway. If he wants to be treated as a private person and have those First Amendment protections, then let's treat him as a private person. If he's acting as a peace officer, then we go to the Garcetti standard. If he was acting and saying, I'm a peace officer, treat me like one, that's a different standard. But let's treat him like a private person. You wrote the letter as a private person? All right. That's your private opinion. We'll treat you as a private person. You're like anybody else. We understand your argument. You've already used up your time. All right. Thank you. Thank you. Good morning, Your Honors. May it please the Court, my name is Mary Pat Berry and I represent David Saunders and Anne Branson. Mr. Prate and I had intended to divide our time. May I have time? Yes, please. Yeah, sure. And, Your Honors, the point that Mr. Branson and Ms. I'm sorry, Mr. Saunders and Ms. Branson raised, and that I'd like to discuss with the Court this morning, is our position was that the district courts failed to properly address the issue of whether or not Mr. Prancevich's rights were clearly established. That the Court approached that question using the broad generalities that the United States Supreme Court has directed lower courts not to use. And that when the Court did that, it failed to do the particularized contextual examination that it should have done in this case. And that particularized examination would require the lower court to do the Pickering balancing test, which I discussed in my briefs. And when you look at the Pickering balancing test and balance the interests of the district attorney's office in performing its public safety responsibilities, and contrast those with Mr. Prancevich's rights. Does it make absolutely no difference? Let's suppose that we were, it was clear that the Chief had no business doing whatever he did. First of all, there is a difference in testimony as to what he said, and I don't know what your position is about that. But what is your understanding of what he was banned from doing? The understanding of Mr. Saunders and Ms. Bramson, who both spoke with the Chief, was that the Chief was stating that Mr. Prancevich was no longer welcome at Santa Maria Police Department. In other words, that he was banned. For any purpose. He just can't come. Correct. All right. That was their interpretation. Yes. And assuming they said that, and the reason was because of something he'd written in the newspaper about something that had nothing to do with his job. And suppose it was clear, as I must say I think it is, that that's a First Amendment violation. Do you have the right then to limit this person's job because of that First Amendment violation? Aren't you then accepting, aren't you essentially ratifying the First Amendment violation at that point? I don't think that the District Attorney's Office is. And I think what the courts have said is that a government employer has some ability to restrain their employee's speech because of the particular situation of an employee being paid a salary to perform the mission of the employer. And in this case, the employer's mission was a very important one, public safety. So although the employer is faced with an outside third party. But it's not outside, actually. They're both the government of, they're both, they're different departments of the government, but they're both, what, the county government? They're not both county government. The City of Santa Maria has its own police department. The county runs the county district attorney's office. I see. All right. But Your Honor raises an important point that goes into the Pickering balancing analysis, which is that everyone involved here is law enforcement. And so when the Santa Maria Police Department chief commands his staff. Suppose he had said, you know, we don't let black people in this office. And so they said, oh, well, fine. If they don't let black people in the police office, I'm going to send them to Lompoc. Is that okay? If the chief said I'm not going to allow black. This is an African-American employee of the DA's office. And the police chief says I'm not allowing African-American people in my office for any purpose. So can the DA say, oh, all right, fine, we're sending you to Lompoc because the chief isn't going to allow you in because you're black? Your Honor, I would suggest that the district attorney would look at that issue and determine how it goes ahead and meets its public safety responsibility while dealing with a chief of police that's behaving in that way. I mean, the problem is that. Is that not race discrimination itself? Don't they have to find some way to accommodate him that is not detrimental to him when he's being. The reason for what she's being barred is an illegal reason. And, Your Honor, the authority, at least with regard to these First Amendment cases, does not establish that in the context of this case, the district attorney had a responsibility to try to accommodate the chief's ban on Mr. Prancevich. That the district attorney could consider its important. Well, how about accommodate Mr. Prancevich, not the police chief? Even with that, Your Honor, there's no authority that says the district attorney's office has to try to accommodate Mr. Prancevich. But why at that point isn't the DA also retaliating against him for his speech? You know, I can understand that. It feels like there's just this layering of addressing Mr. Prancevich. But there's no difference between this and my hypothetical, is there? I'm sorry? Is there any difference between what I just said, between this hypothetical I gave you about an African-American employee and this First Amendment violation, if in fact it was a First Amendment violation for the chief to ban him? Well, I think there's a difference just in that the reason that Mr. Prancevich's speech became a problem was because of the preexisting relationship between Chief Magana and this particular investigator for the district attorney's office, that it was a targeted action by the chief against a particular officer or investigator who he had a ---- But then you're saying that the DA is responsible and has to be able to justify its actions based on the balancing of the First Amendment interest and the chief's interest. But if my hypothetical is that the chief was ---- didn't have a First Amendment basis and it was a First Amendment violation, let's assume it was a First Amendment violation for him to not ---- to do what he ---- to ban the plaintiff. Can you then ---- your agency then say, oh, well, fine, we're just going to send him to Timbuktu, because even though the chief has ---- because he said something ---- I mean, it traces back to something that he said. And instead of saying, well, you know, the chief has no business doing that and we can't act to his detriment because of it, you say, oh, well, we're just going to, you know, recognize that the chief ---- treat the chief's action as a fait accompli and ignore its basis. And, Your Honor, what you describe is exactly the reason that Mr. Bramson and Ms. Saunders are arguing that they are entitled to qualified immunity here, because there's no clear rule that says they have to now lower their public safety responsibility and set it aside, so to speak, to accommodate an outside third party's action that is violating their employees' First Amendment rights. It's not ---- I mean, by your very question, it indicates that what Mr. Bramson and Ms. ---- Mr. Saunders and Ms. Bramson were confronting was not beyond debate, that it was a very difficult situation involving this outside third party that was a critical law enforcement partner to the district attorney's work, at the same time that that outside third party is taking action that's compromising their ---- There's also a record that demonstrates that this guy has actually been to this police department about three times in 10 years or something, right? Mr. Prancevich's testimony, yes, was that he had been to the Santa Maria Police Department three times in five years. And for Mr. Saunders and Ms. Bramson, again, as Ms. Bramson was the action district attorney, they have to know that they can have their office do its job. And so, although Mr. Prancevich indicates he had been there physically only three times, what the action by Chief McConaughey did is it really impacted more than just Mr. Prancevich's ability to go to Santa Maria Police Department. That kind of a command from a law enforcement chief more or less puts a scarlet letter, so to speak, on Mr. Prancevich with every employee of the Santa Maria Police Department. Well, why is that so? Why should that be true? I think that's true because, I mean, your court has recognized... That's a relationship that's so delicate that if you have one employee of the Santa Barbara DA's office that expresses a public opinion as an individual, that somehow that is going to cause the chief of police of Santa Maria to be hostile towards the district attorney's office. Is that what you're saying? Well, Your Honor, what we know is that, in fact, it did cause the chief to be hostile towards Mr. Prancevich. They had an existing relationship. It wasn't a positive one. The language in Mr. Prancevich's letter called the chief more or less a liar. His opinion was ridiculed by Mr. Prancevich as outrageous. And Mr. Prancevich more or less stated that the Santa Maria Police Department was not doing its job of law enforcement and its failure to do so was to the detriment of the safety of the citizens of Santa Maria. All of which he had a right to say as a private citizen, correct? And as a result of his having said that, he's transferred. Well, and Your Honor, what the Pickering balancing test states and what courts have looked at is there's a certain burden of caution on the part of the government employee who's paid the salary. And in this case, Mr. Prancevich, by his own actions, recognized that burden of caution. He tried to retract the letter. But that's a different argument, a completely different argument. I mean, that's an argument that says that it was okay to retaliate against him because of the balance. The argument, the principal argument you're making, as I understand it, is that even if the chief was violating the plaintiff's First Amendment rights, your clients could nonetheless send him to a law pocket at a cost of money and time and so on because the chief was going to limit his access to the police department. That's a different argument than the argument that because of what he said, it was okay to limit him from going to the police department. Which one are you arguing? My argument is not that the district attorney's office made any judgment about the contents of Mr. Prancevich's speech. Right. So the fact whether he had second thoughts or whether he should have said it or anything like that is not relevant to your argument. Well, it's relevant, Your Honor, I think, to the Pickering balancing test, which is relevant to my argument because in order for a court to conclude that it was clearly Tell me why it's relevant to the Pickering balancing test. I'm sorry, what? Tell me how it's relevant to the Pickering balancing test. Because in order for the court to determine that Mr. Prancevich's right was clearly established, the court must first determine that, in fact, his speech was protected. And the way to analyze and determine whether or not his speech was protected is to go to the Pickering balancing test and balance the strong interest of the employer against the interest of the employee in the speech. And so that's why the lower court, I think, misstepped by not conducting that Pickering balancing test and instead simply stating in a broad brush, well, there's a First Amendment right that protects employee speech on an issue of public concern and there's an existing cause of action for retaliation under the First Amendment. And that's what the district court judge did. So the district court judge didn't look at all of these balancing factors, which effectively Mr. Saunders and Ms. Branson did have to look at and try to decide how do we handle this, which goes to their argument that it's not clearly established. It's not the only one. Sotomayor My understanding of their position is it doesn't matter what he said. Our problem is just that the Chief didn't want him there anymore and we could just ignore the fact that it was because of something he said. If they weren't, if he had said something different, they would have done something different? No, I mean, you're right, Your Honor. I mean, Mr. Branson or Mr. Saunders and Ms. Branson's position is that they were responding to the reaction of the Chief. But there's no balancing to be done because they are not arguing that what he said was any detriment to them. They're just arguing that because of what the police's reaction, the police chief's reaction was, they could do what they did. But for purposes of But no matter what he said, even if it was completely protected. But for purposes of assessing whether or not Mr. Saunders and Ms. Branson are entitled to qualified immunity, I think the Court presumes that the plaintiff has met his burden to show the first three steps of an employment of a speech retaliation case. And now the burden becomes the defendant's burden to show that their action was justified. Whether they had an adequate justification. Is that the prong you're talking about? Yes. Well, isn't even that disputed here? Because you're saying that the justification for Saunders' action was that the police chief said this to him. But isn't there testimony from Joshua Lynn that they did this to punish Prakovic? Well, Mr. Lynn's testimony, Your Honor, he was a senior child deputy. He was present at the executive staff meeting when the district attorney staff discussed how to handle the Prakovic ban. Mr. Lynn testified that he worked in the South County, not the North County. He didn't know what was required of an investigator in the North County with regard to interactions with Santa Maria Police Department. And he stated simply that Mr. Saunders was angry but calmed down during the meeting. That Ms. Bramson stated she had an angry police chief to deal with who was banning her investigator from his department. And Mr. Lynn himself stated, be sure when you tell Mr. Prakovic we may need to do this transfer, you let him know it's not punishment. That it's just so we can have the district attorney's office being effective operationally. But doesn't he testify in substance that Saunders was intent on punishing him for writing the letter? Isn't that Lynn's testimony? No, I don't think that is a fair representation of what Mr. Lynn's testimony was. Mr. Lynn agreed that if we can't, what he wanted Ms. Bramson to do was to, and this is his language, to happy hand the chief. In other words, to call the chief, try to appease him. Well, Ms. Bramson had done that. Mr. Saunders had called the chief once, met with the chief at the county law enforcement chief's meeting to find out if the chief was serious about the ban. Ms. Bramson then called the chief, and then at the executive committee meeting even said before you do anything, Mr. Saunders, call the chief one more time and be sure that he's still saying that Mr. Prakovic is 86 or prevented from entering the Santa Maria Police Department office. So Mr. Lynn was saying, let's try to appease the chief. Well, they had tried that. It was unsuccessful. And so Mr. Lynn said, if we can't keep the chief from preventing Mr. Prakovic from going into the police department or working with SMPD and doing his job, then we need to transfer him. We need to take some kind of action that allows us to continue to do our important public safety work and be sure our investigators can get the work done they need to get done. So I think it's a misrepresentation to suggest that Mr. Lynn was absolutely stating he knew for a fact that the district attorney's office was trying to punish Mr. Pransvich. That was not... That wasn't his testimony. No. No. There wasn't a threat by the chief of police of Santa Maria that somehow this would have an adverse effect on the entire district attorney's office and its investigators. No, this was a very direct, really direct targeted action by the Santa Maria Police Department directly at Mr. Pransvich. Now, in the district attorney's north office, and actually at that time the district attorney, it was when county government was going through serious budget problems, Ms. Branson had been acting DA for 20 days. She was facing a $4 million budget shortfall. The staff in Santa Maria was down to two investigators. So by the chief's action against Mr. Pransvich, if Mr. Pransvich can't go do what he needs to do on his cases at Santa Maria Police Department, there's no one to fill in that position for him. There's no one to cover for him. So the chief's action was directed at Mr. Pransvich, and the district attorney saw it as this is Mr. Pransvich being unable to do his job, not the whole district attorney's office. And that's why the action that was taken, and it was an effort by the district attorney. I think it was a really measured action. It was to send Mr. Pransvich 16 miles farther away than he was, not what would have been more like punishment, which is 70 miles more to drive down to Santa Barbara every day, to transfer the Lompoc investigator to Santa Maria. Then they had two welfare fraud investigators who could do their job without any problems arising at the Santa Maria Police Department. All right. Thank you. Thank you. Good morning. Michael Morgus for Rick Pransvich. Obviously, there's conflict in the testimony, as you've heard from both defendants, as to exactly what Chief McCagney said, and I suppose how the DA's office interpreted it. And there's a dispute as to whether the DA's office itself was motivated to punish Pransvich, as discussed in the testimony of Joshua Lynn, which is in the record. And when I cite to the record, I'm citing to the record in the record. Well, he doesn't ever suggest that they were motivated to punish him because of the speech. He sort of says they were motivated to punish him because he was generally a pain in the neck. I mean, is that what he sort of says? Does he ever say that they were motivated to punish him because of this talk, this letter? The testimony is that it was to punish him. If it was because he was a pain in the neck. Well, where's the testimony? What are you referring to? I mean, he talks about they talked about other things he had done, but where do they suggest that? It was because of the letter that they wanted to punish him. Give me just a second. I just had it while I was listening to counsel. Pages, if you look in the record in appeal number 11-56798, that's the city of McCagney's appeal, because I'm dealing with two excerpts. I understand that. Page 361, which is volume four, that's where the cited testimony starts. 361, 362. I'm just reading through it right now. In the conversation, they discuss the transfer, send him to Lompoc. That's on page 362. Lompoc was sort of the new Cayuma office, which doesn't exist. That's on page 363. Let's see. Ann and Dave Saunders talk about it multiple times. It's also on page 363. Page 26. In the meeting, the context, and I'm sorry, page 364, he goes on further to talk about sending him to Lompoc, and it lines 19-22. In the meeting, the context was obviously punishment. That doesn't seem to be unclear. Are you reading or are you just talking? I'm actually reading what that says right there. No, I'm actually reading what that says right here. Judge Berzon asked me where in the record the testimony is, and I'm citing to it. What does it say? It says that in the meeting, the context was obviously punishment. This is Lynn's testimony. Lynn's testimony. That doesn't seem to be unclear. That's on page 364 of the record. Okay. A jury could conclude, Your Honor, that since there was no transfer until this act, that this act could have been the motivation for the transfer, this act being writing the letter to the newspaper. I want to focus for a second on the county's argument that the district court should have applied the Pickering test. Part of the problem with that was what was pointed out by Judge Ahman, I hope I'm saying that correctly, that there is a conflict in the evidence as to what the motivation was for the transfer. And one possible reason is the DA's office itself was upset with Prancevic because he wrote the letter. If that's the case, I don't even see how you get to Pickering if you're the DA's office. Well, the judge found that there were factual disputes that she couldn't definitively apply the Pickering balancing test, because applying the balancing test entailed involving a lot of factual disputes. And that's why the denial of motion for summary judgment needs to be affirmed at this point, because that's the procedural stage that this litigation is in. The attorney for McCagney, Mr. Prayett, talked about the Claremont case and said Claremont is the first case that ever said that somebody from outside of the agency could be responsible for what the agency does to an employee. That's not necessarily true. First of all, the Claremont case itself reversed the granting of qualified immunity to a government employee who was not the employer of the plaintiff and reversed the denial of summary judgment that the law was already clearly established. In fact, that's one of the headings in the case at page 1109. There are also other cases going as far back as 1978 that say you don't have to be an actual participant in the adverse action or actually be the one that deprives the person of their constitutional right, causes the injury. As long as you are somebody who sets that in motion, knowing or reasonably knowing that it's going to result in an injury, you have liability for the constitutional violation. How many adverse actions are there here? Is the adverse action just the transfer? Or is it also being excluded from the office? Well, being excluded from the opportunities that the office, when you say the office, do you mean the office of the... I mean the police chiefs. The police chiefs. So is there just one adverse action here, which is the transfer to Lompoc, or are you claiming more than one adverse? The transfer, not being permitted even by his own employer to go to the police department. And then the opportunities he was deprived of had he been permitted, had he otherwise been permitted to go to the police department, training opportunities. The transfer also resulted in an increased financial burden on him just for making the daily trip. So there were financial, potentially promotional or pay deprivations. So there are a number of adverse actions. So is it your argument that the DA and the police chief acted together on one adverse action, which was not being permitted to go back to the police chief, to the station? No. I would say that they independently, as opposed to asking for permission to go back to the police department. They independently, both independently caused this action. The police chief, insofar as he says if this testimony is to be believed at the end of the day, he is not allowed here. The department, his employer saying, I'm sorry, the police chief saying he's not allowed to be here. Just as a private citizen, I think that's a First Amendment violation. And I know that the chief was arguing that he's entitled to exclude people from restricted areas. But this is, before he was allowed to be in restricted areas, people in his position are permitted to be in restricted areas. And now he's treating trans-civic differently from similarly situated persons. And I don't mean that in an equal protection sense, but he's being treated differently for exercising his First Amendment rights. So both as an individual, as a private citizen, and as an employer in this whole law enforcement world that works together. The department, because it transferred him. Now, I understand the county's argument to be something like this. Our hands were tied. What were we supposed to do? We were told he's not allowed to be here. And that has a certain superficial appeal to it. But this is the chief of police of a government organization. He is not the government unto himself. In order to establish that the factors under Pickering, substantial, material, that he is not the government unto himself, substantial and material disruption, not real or perceived or not real or imagined, you can't just say, well, the chief said he's not allowed there. That's the end of that. I guess we can't send him there. You can call the city manager. The police chief is merely the office of the police chief. He doesn't have the final say as to whether somebody is permitted in a government building. And when actually asked about it, he said, oh, no, no, no, he's allowed to be here. At least this is his testimony. He just needs to have a badge and check in. So even if the DA had made an effort to show that it meets the threshold under Pickering in order to transfer Prancevich, if it had made any attempt to actually show that, that would have led to the chief saying, no, no, he's allowed at the department. We just want him to check in so that we know he's there or something like that. So this discussion by the county that the district court blew it by not deciding in its favor under Pickering is just wrong because there's a conflict in the evidence. And I think it lets the county off too easily under Pickering by just saying, well, that's what the chief said. I was just following orders. And I don't think that that applies. If the chief had said, if Prancevich comes to the department, I'm going to have him arrested and thrown in jail, I'm sure the department wouldn't, the DA's office would not say, well, I guess we better not send him there. They would have said, you can't do that. We're trying to get him to do his job here. You are the chief of police. You are one member of the government. You don't get to make that say. If he said, yeah, I really am going to do that. The question is, at that point, is the county responsible in any way for the First Amendment retaliatory behavior, assuming that that's what we have? Or is it entitled to take the fait accompli and say, well, we just have to deal with it? And let's assume also there was no conflict in the evidence. And sure, it goes to the chief of police. He has no business doing that. But we don't have any control over him. And we're just going to have to work out our job situation as best we can. What's wrong with that? I don't think you need to yield. The county has a duty to yield to the chief's unreasonable response, particularly when that response is that he has no choice. So the question is, what do they do next? I mean, is your complaint that they should have, like, made him, told him to get over there and barge in and tell the police, the police chiefs, and you sure certainly are going to go in and go behind the desk? Or is it that they, or is your position instead that they should have in some other way accommodated him? And if so, why? Why do they have a responsibility for the chief's unreasonable response? Why do they have a responsibility for that violation of the First Amendment, assuming there is one? This hypothetical I gave you was supposed to help me, so let's see if I can keep it going that way. Because just as with the faxes presented by either defendant, some work is required on the county's part to determine whether there is an actual disruption, a substantial disruption, or whether it's just imaginary. Is this the chief's operation or their operation? A disruption to their operation because of the chief of police's conduct. That's what you're asking me, correct? Well, I'm trying to find out what, let's assume they determined that the chief of police has committed a First Amendment violation, but we don't have any control over the chief of police. So this guy is not getting into the police office. Then why? Okay. It's the city of Santa Maria. We could call the mayor. We could call council. We could call the city manager. We can get together at a table and figure out, what do we do about this? Do you really mean this? Because they have some responsibility for this First Amendment violation because it's getting in the way of the plaintiff's job or exactly what? That might be good policy, but I want to know what their constitutional obligation is and why. Right. Their constitutional obligation in order to transfer an employee based on what the chief did is analyzed by Pickering. And under Pickering, and I know I've already said this, but some effort by the employer... But that's assuming that they have a responsibility for, I mean, it strikes me that it's kind of like the cat's paw cases in the discrimination area. And I think there are some First Amendment ones, too. If some, in other words, there's a causation here in the sense that his speech ends up being the reason he's transferred to Lompoc. Is that good enough to hold the county responsible for the First Amendment infringement? And then, because unless you're going to hold them responsible for the First Amendment infringement, you're never going to get into a balancing, right? Well, if you're the agency that's transferring the employee and you're doing it because of... It certainly traces back to his speech. It traces back to his speech. Right. So that's without question. But the hard question is, does the county have to worry about the speech, or can they just stop worrying at the point that the police chief is saying we're not letting him in here, and can they just take that as a fait accompli, as if the police chief had just said, suppose the police chief had said, I have a new policy. None of your investigators can, you know, come behind the desk and tell me what to do. Well, I don't think that answering that question would really yield any, would shed any light on the question that's actually before us, because that's not a question of balancing First Amendment rights. That's just a blanket... Except that I'm trying to ask you why we're balancing First Amendment rights. Here's why we're balancing First Amendment rights. If pickering means anything in the Anton case, if they mean anything, it means that a burden shifts to the employer, in this case the employer, the county, to determine, is this an actual disruption? Does he mean... They have to do something. That is what I'm saying their obligation is. Because otherwise, pickering is, it goes back to real or imagined. And that's because for some reason, it's, if the police chief had just said, no more investigators in my office anymore, and they have to stand by the front desk like anybody else, that wouldn't be a problem. So you're saying that somehow the reason that he gives for saying exactly the same thing becomes the county's problem. Because there's a causation relationship, or exactly why? Because there's a causation relationship. Causation being the speech. And that's why we're getting into a pickering analysis, because ultimately the reason he's being sent to a lump pocket is because of something he said. If you follow the causation chain. Is that essentially your position? Yes, that is. And while I realize there's a conflict in the evidence as to whether that motivation came from the chief or what the chief said or the county's own... So your position, even though there is some evidence that the county officials themselves were mad at him because of what he said, your position doesn't depend on that? No. I think that's an alternate basis for First Amendment liability right there. That they themselves... But even if they were completely in good faith, they weren't mad at him at all, they really liked him, but they were in a pickle because of what the chief was doing, even though knowing the chief had no business doing this. They still have to get into a pickering, balancing and so on. Yes, because they are in a position to say, we're not going to transfer this person. The county is in a position to say, he's not allowed at the police department, so you say. We still are going to have him do this job. And if you're not going to cooperate with us... I mean, they can do that. And they are making the choice to transfer him based on some basis. It's somebody's unreasonable response to what that person, the chief, put out there in the first place by writing a letter to the editor. And then their next argument is, well, even so, that's new law and we should get qualified immediately. Who argues that, the chief or the county? The county. I'm talking about the county. That is not new law. What's new law about it, that you can't transfer somebody for their protected activities? I don't think that's new law. That's as old as any of the cases that we've cited in this case. Unless there's any other questions, I move for further. Mayor, two minutes. Two quick points. One, the county is the one that took the initial action after reading his letter. They initiated the call that started this whole thing in motion. Had they not made that call, Chief McConaughey never would have expressed an opinion, never would have said a thing. He read the letter, it was water off his back. That starts this all in motion. My question to the court, I guess, is, and we cite in our brief, page 28, page 29, all the Supreme Court law that says, the government has the right to restrict government employees when they disrupt the operation of the agency. Even though it's a First Amendment issue, even though it's based on speech, the government doesn't have to just... What evidence is there in the record that he disrupted the operation of the agency? He would have. And what's the evidence of that? Well, we know post-incident that when there was a pallbearer called for for the retired chief's funeral, Santa Maria cops who had read his letter said, I hope the DA representative isn't Prancevic. We don't want, we, not just the chief, Santa Maria cops don't want him. What if... It has nothing to do with his job either. What if Prancevic had said all Santa Maria cops are corrupt? He has that right. But he didn't say that. No, he said the chief's a liar. He said the chief is ludicrous. He's critical of the chief who operates the police department. Protect his speech. He can say that all he wants. I agree. It's a First Amendment right. And you agree the chief cannot ban him from the police station based on that, those comments? Outright ban or ban him from... Can he say, that's your opinion, Mr. Prancevic. You're entitled to that. But now to operate my organization, I need to keep you out of disrupting it. Come to the front counter if you have business to do. How is he disrupting it? Just because the cops don't like what he said? Is that how he's disrupting it? So now I have to let him into my facility because he's a malcontent, because he's an ex-Santa Maria employee. So you say it's an appropriate response to not allow him in your facility based on that? In the restricted areas. Of course, again, this gets us back to the stupid issue of fact. I understand that that's what the trial court relied on, was that that's a material fact. But what I want to make sure is that we're not saying that the police chief doesn't have the right to impose some restriction on somebody who is critical of his agency saying, fine, that's your First Amendment right to say that. But I also have a right to control the restricted areas of my facility. Come in. Go out in front if you want. Picket on the public sidewalk. Say Santa Maria Police Department is a sanctuary for illegal immigrants. It's your right. But now don't come into my restricted area without some control of a visitor pass. He didn't even say you can't come in. Just check in so I know you're here. Get a visitor's pass and conduct your business. And remember, as I say, the chief isn't the one who initiated this. We know that that's not what the officials in the county thought he said. Officials in the county agree. They interpreted it one way, but not based on something the chief said because their own evidence shows all he said was he's not welcome. Transferring him was never an issue. So the jury couldn't interpret it the same way? I suppose they could. So therefore, there's conflict in the evidence and we have and there should be some rejudgment. And we can't you can't prevail in your qualified immunity appeal either because taking the evidence in the way most favorable to the plaintiffs, there could be a claim. Well, except and I still don't understand where it's clearly established that a police chief receiving a call, unlike Claremont, and the district court also relied on the Heidrich versus Hunter, which unfortunately at the time had already been vacated by the Supreme Court and then the Ninth Circuit reinstated qualified immunity when the Heidrich case came back from the Supreme Court. So the only law the district court relied on, even assuming the facts most favorable to Mr. Prancevic, one, Claremont, occurred post-incident. The chief changed the access of this man to the police department from what it was before to something else, right? Yes, if you assume the facts. Which way the phone call went is completely irrelevant because that was the net result. You can't come here. What's the difference who started the phone call? So therefore, that's what we have to focus on. Well, I think it is a big difference because the chief, when he read the letter, did nothing. Okay, fine. So should he continue to do nothing? But in the end, he did something. Because he received a call from the employer saying, chief, we need to do something about this. Chief said, fine. He's your problem. Do whatever you want. He didn't say transfer him. He didn't say do anything. He just said, from my perspective, I don't want him in my, he's not welcome in my facility. In response to an unsolicited phone call from the employer, and the employer is the one who ultimately takes the action. And I don't think the court's prepared to say it's a First Amendment right that a police chief can't say, I don't have control over my facility, to keep out malcontents. He can come to the front counter. He has his First Amendment right to say what he wants about me. But the Supreme Court has said, in San Diego v. Roe, and this court has said in Brewster v. Board of Education, the government has the right to keep out malcontents and restrict its control to everyone. First Amendment is not an absolute access to control areas of a government facility. And that's all the chief did. So how is that a First Amendment right? Thank you. What malcontents were they talking about in that case? In which? The one, the malcontents you're talking about. Anyone critical of the government. In other words, yes, in Roe and the other cases, Brewster, if you're critical of the government, you have that First Amendment right. I'm not in any way implying you don't. But then does the government have the right to keep you out of areas that are restricted? The government facility itself. And I think clearly the law says you do, which is all the chief did, and I don't see how that violates the First Amendment. Well, he said you're not welcome here. You're not welcome in my, you come and you get a visitor pass like any other person, like any other police officer who, you know, out of state police officer, somebody like that. It's a courtesy that the chief had extended to the DA's office. I know your guys. We get along well. I trust you in my facility. You can come walk in the back if you want. You say something that's going to disrupt my organization. Come in. Let me know you're here. Get a visitor pass. Go do your business, even in the controlled areas. It disrupts the organization because what the police officers are protective of the chief and what this person has said reflects negatively on the chief and also on them. And so they can have that hostility towards him. And when he shows up, they get their hackles up, and they're not happy about it. So it disrupts the operation. Sure. And it divides the organization. You know, maybe he then aligns himself with people who agree with him. And then all of a sudden now we've got two encampments at the police department, those who think it is a sanctuary and those who think it's not. And the police chief doesn't have to allow that in his facility. Make your comments in the press. Pick it out front. Come to the front counter. But I'm not going to let you in the back where I have no idea that you're even here. You get a pass. You come in. You do your business. And you leave. So if the chief expresses his personal political views in the press and a person comes in who's expressed a contrary political view, that can be looked upon as a disruption. And that person isn't welcome. And it can create dissension in the ranks of the police officers. Well, certainly the police chief has the right to express his opinions, as does, in this case, Mr. Prancevich. The police did express his opinions in a public letter. He did. And all Mr. Prancevich did was respond to that public letter. I agree. And the police chief did nothing about it. He said, you have that right to. He did something about it. Only when asked. I think it's enough. All right. Thank you. Very interesting case. Thank you for coming here. Enlightening discussion.
judges: Amon, Pregerson, Berzon